**Americo DiCIOCCIO, Stanley A. Bikulege, Walter E. Bodnar, Albert J. Bartosh, Ralph H. Stidham, John J. McCloskey, individually, and on behalf of all others similarly situated, Plaintiffs,**

v.

**DUQUESNE LIGHT COMPANY, Retirement Plan for Employees of Duquesne Light Company, Supplemental Retirement Plan for Non–Represented Employees of Duquesne Light Company, and Dianna L. Green, Defendants.**

No. 93–442.

United States District Court,
W.D. Pennsylvania.

June 29, 1995.

Ellen M. Doyle, Malakoff, Doyle & Finberg, Pittsburgh, PA, for Plaintiffs.

Samuel W. Braver, Buchanan Ingersoll, P.C., Pittsburgh, PA, for Defendants.

## OPINION

DIAMOND, District Judge.

Plaintiffs, a class of retirees at Duquesne Light Company ("Duquesne Light"), commenced this action pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, seeking a declaration that the defendants are required to include in the calculation of pension benefits under two retirement plans income from the plaintiffs' exercise of stock option and appreciation rights acquired pursuant to an incentive plan. Plaintiffs contend that they are entitled to a recalculation of their benefits consistent with the formulas contained in the retirement plans. A subclass of plaintiffs also contend that their accrued pension benefits were reduced improperly due to a change in the social security wage base prior to their retirement date. In addition to the substantive relief request, plaintiffs seek costs, expenses and reasonable attorney's fees associated with this action. Presently before the court are cross-motions for summary judgment. Both parties mainly rely on the same documentary evidence and deposition testimony to support their positions and contend that the factual record demonstrates that they are entitled to judgment as a matter of law. For the reasons noted below, the parties' cross-motions for summary judgment will be granted in part and denied in part.

### Standard of Review

■ Fed.R.Civ.P. 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's claim, and upon which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial,*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Electric Industrial Corp. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (*quoting* Fed.R.Civ.P. 56(a), (e)) (emphasis in *Matsushita* ). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ The recent Supreme Court cases discussing the standards for granting summary judgment have established that the

motion "is no longer a disfavored procedural shortcut...." *Big Apple BMW, Inc. v. BMW of North America*, 974 F.2d 1358, 1362 (3d Cir.1992), *cert. denied*, 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993). While the court is not permitted to weigh the facts or the competing inferences therefrom, the court is no longer required to "turn a blind eye" to the weight of the evidence. *Id.* In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In establishing a genuine issue of material fact, the opponent "cannot merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs." *Harter v. GAF Corp.*, 967 F.2d 846 (3d Cir.1992). Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion. *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382–83 n. 12 (3d Cir.1990).

### Background

The named plaintiffs are representatives of the following class which the court certified on October 28, 1993:

All participants or former participants in the Duquesne Light Long–Term Incentive Plan [Incentive Plan] who have retired or will retire after March 1, 1990 under the retirement plan for employees of Duquesne Light Company [Retirement Plan] and/or the Supplemental Retirement Plan for Non-represented Employees of Duquesne Light [Supplemental Plan].

Document 17 at p. 5. On February 1, 1994, the Chairman of the Board and Chief Executive Officer of Duquesne Light issued a notice which indicated that the Board of Directors had amended the Retirement Plan and the Supplemental Plan ("Plans") to exclude from the Plans' definitions of compensation the type of compensation at issue. On February 3, 1994, the Plans' Administrator notified the participants under both Plans about the upcoming change. The notice indicated that the amendment was to operate prospectively. The plaintiffs do not explicitly challenge the propriety of the Board's amendments to the Plans nor seek relief beyond the amendment's effective date of March 1, 1994. Defendants are the Plans' sponsor, the Plans and the administrator of the Plans.

The Retirement Plan is an ERISA defined benefit pension plan designed to cover management employees who are represented by collective bargaining units. The Supplemental Plan is an ERISA defined benefit pension plan which provides benefits to employees of Duquesne Light who are not in collective bargaining units. The Retirement Plan and the Supplemental Plan were both amended on or about January 1, 1985, and modified on March 10, 1987. Both plans are qualified plans and pursuant to the defined benefit formulas set forth therein contain the following definition of compensation:

"Compensation" means, with respect to a calendar year, the amounts reported by the employer to the Internal Revenue Service on Form W–2 as the participant's compensation for the year; but excluding any amounts attributable to relocation expenses, transportation mileage, imputed income derived from insurance premiums and such other extraordinary items of remuneration as the plan administrator shall determine from time to time pursuant to such uniform and nondiscretionary rules as he shall adopt.

The relevant summary plan description ("SPD") for the Retirement Plan, which became effective as of January 1, 1989, provides:

#### Compensation:

The remuneration paid to an eligible employee for the performance of job duties, including wages or salary, overtime and/or shift premiums, gratuities and other payments which were reported as income for federal income tax purposes on that employee's W–2. Also included are all amounts contributed by the employer on behalf of that employee under a wage-salary reduction agreement (e.g., under a 401(k) retirement savings plan). Compensation does not include amounts attributable to transportation, mileage, relocation expenses, meal allowances, imputed income

from insurance premium payments or other similar extraordinary payments or amounts in excess of allowable limits under the law.

The SPD for the Supplemental Plan was last published in 1981. After November 1989, an employee requesting information on the Supplemental Plan received the SPD for the Retirement Plan with an explanation which indicated that the SPD generally covered both the Retirement Plan and the Supplemental Plan and that a new SPD for the Supplemental Plan would be published after finalization of the new Internal Revenue Service regulations applicable to that plan. The 1981 SPD for the Supplemental Plan remained available to participants upon request.

In 1987, Duquesne Light initiated a Long–Term Incentive Plan ("LTIP"). The LTIP was first discussed by the Board of Directors at a meeting of the Compensation Committee on January 15, 1987. Duquesne Light had experienced financial difficulties in 1986 and 1987. There were no merit increases for Duquesne Light employees in 1985. There were no merit increases for employees in salary grades 18 and above in 1986. There were no merit increases for employees in 1987. The company had experienced lost sales, a reduction in dividends, a decrease in the price of its stock and the closing of plants and layoffs. In light of this background, the LTIP was presented to the Compensation Committee in order to provide it "with an independent indication of the reasonableness of the effect of the plan on total salaries." The chairman of the committee indicated that "with the company's recent cuts in personnel, company employees had assumed additional work responsibilities and should, if possible, receive some reward and recognition for their efforts." Senior management formally presented the LTIP to the Board of Directors on January 20, 1987, and described it as the "1987 Proposed Salary Program."

After the Board formally adopted the LTIP, the LTIP was presented to the employees in a letter dated February 11, 1987, from Wesley von Schack, Duquesne Light's CEO, which stated: "We plan to use Duquesne Light common stock options as a means of compensation in 1987." [1] Management employees were then given a presentation regarding the LTIP and therein it was described as "a performance driven compensation program." Thereafter, numerous documents were distributed to employees regarding the LTIP, the operation of it and the fact that it represented a new compensation program. Duquesne Light also distributed to management employees a questionnaire on the LTIP. One question read as follows:

Will the program replace pay for performance?

No. This is a one-time allocation and there is no intent to keep it available to all employees. We anticipate a return to a more traditional approach to employee salaries in the future. Like merit increases the LTIP was funded from normal salary expenses.

The employees were further informed that the exercise of their stock option and appreciation rights under the LTIP would specifically result in recognized taxable income for federal tax purposes on the employees' W–2 forms.

The LTIP was structured so that the employees did not recognize any taxable income until they exercised their stock option and appreciation rights. After exercising their stock option and appreciation rights, the employees received statements which indicated that the LTIP income and the dividends accredited to the participants' accounts were a percentage of their current annualized salary.

All management and professional employees who were active on the date the stock option was granted and who had received on a scale of 1 to 5 a performance rating of "3" or better in 1986 were eligible to receive the

---

1. Von Schack's letter also stated:
 You should be aware that the plan is only for 1987 and is not intended to be a continuing program for all employees. Given the freeze on salaries and other austerity measures taken by the company, we believe that this is an excellent way to recognize your individual efforts in these difficult times and also provide you the opportunity for a financial reward tied to the company's future performance.

LTIP stock option and appreciation rights. Management and professional employees with a performance rating of 2½ were eligible with a recommendation from their immediate supervisor.

The Compensation Committee of Duquesne Light's Board administered the LTIP. The committee was given discretion to determine which eligible employees should receive the options and how many options a particular employee should receive based upon the following criteria:

> ... the Committee shall consider the position and the responsibilities of the employee being considered, the nature and value to the Company or a Subsidiary of his or her services, his or her present and/or potential contribution to the successes of the Company or a Subsidiary and such other factors as the Committee may deem relevant.

As a merit-based form of compensation, the LTIP is not subject to Internal Revenue Code rules forbidding discrimination in favor of highly paid employees under tax-favored benefit plans.

The LTIP permitted the salaried employees who were given stock option and appreciation rights to exercise their options up to ten years from 1987, however the first exercise could not take place until 1989. Under the LTIP, an employee's options vested as follows: 50% in 1989; 25% in 1990; and 25% in 1991. At no time during the introduction and implementation of the LTIP was there ever any indication that the LTIP was a program designed to provide supplemental retirement income. All affirmative evidence indicates that it was designed as a merit-based program offered as a substitute for salary increases in 1987. At the time the LTIP was adopted, Duquesne Light's common stock was selling at $12.00 per share. The value of the stock increased to $39.00 per share by January of 1994.

When an employee exercised his/her LTIP options, the exercise resulted in taxable income to the employee which was reflected on the employee's W–2 statement. Prior to June 5, 1990, this taxable income was included in an employee's pension calculations under the Plans. The practice which had developed prior to June 5, 1990, treated the recognized income from the LTIP program as ordinary compensation for the calculation of pension benefits under the definition of compensation in the Plans. The income from the exercise of the LTIP rights was included in the pension benefit calculations of the employees who retired prior to June 5, 1990.

In December of 1989 it came to the attention of Gary Schwass, chief financial officer of Duquesne Light, that participants in the LTIP were having the amounts received upon the exercise of their stock option and appreciation rights included in their "compensation" in calculating their pension benefits. Thereafter the corporate secretary of Duquesne Light issued a memorandum which stated in pertinent part:

> Gary Schwass has been raising questions concerning the use of LTIP exercises as part of "compensation" used in pension calculations. Human Resources has been including it. I understand legal believes that is correct ...

> Gary discussed his opposition with [von Schack] at the last Board rehearsal and [von Schack] agreed based on Gary's limited explanation....

After Schwass brought the matter to the attention of von Schack, von Schack spoke to Dianna Green, the Plans' administrator, and indicated that it was his recollection that it was never the company's intention to include the LTIP compensation in employees' pension calculations.

Schwass subsequently opined to George Bentz, Duquesne Light's general manager for human resources, that the amounts should not be included in such calculations. Schwass then brought the matter to the attention of Jim Wilson, Duquesne Light's director of benefits. Wilson had been involved in drafting the language of the Retirement Plan and the SPD which was provided to employees upon request. Wilson indicated to Bentz that the reason the amounts realized upon the exercise of the stock option and appreciation rights pursuant to the LTIP were included in a participant's "compensation" in calculating pension benefits was that the language of the Plans required that re-

sult. Wilson further indicated that if something was defined as "compensation" that definition could not be changed without Board approval.

Wilson discussed the matter with Laura Lane Amelio, a senior attorney at Duquesne Light. Amelio then wrote a memorandum dated September 18, 1989, stating that in order to exclude from "compensation" the exercise of the LTIP stock option and appreciation rights, the definition of compensation in the Plans would have to be amended and that such a result could not be accomplished through discretionary action taken by the plan administrator. After setting forth the definition of compensation in the Plans, Amelio wrote:

> To somewhat oversimplify, the amount of an individual's pension under the Retirement Plans is based on a calculation of the five highest consecutive years' salary. George said that Gary was insistent that to include the LTIP payments would unfairly discriminate in favor of those employees who exercise and receive benefits under the LTIP and then retire, as opposed to those who receive benefits but then do not retire until after expiration of the Plan in 1997.

> I advised George and Jim that, in my opinion, the practice of including the amounts payable under the LTIP in a retiring employees' compensation calculation of retirement benefits was proper under the Retirement Plans. All amounts paid pursuant to an exercise are reportable to the IRS on Form W–2 and are taxed and treated for all respects as compensation to the employee. George confirmed my recollection that when the LTIP was adopted it was specifically done so as a compensation mechanism in lieu of the annual salary increase to employees because of the two year salary freeze in 1986–87. The fact that the awards under the LTIP, and the administration of the LTIP itself, is within the exclusive jurisdiction of the Board's Compensation Committee further buttresses the characterization of the awards as compensation. In any event, the amounts payable under the LTIP certainly are within the definition of "Compensation" under the Retirement Plans.

> George then asked whether it would be possible for the Plan Administrator to declare such amounts not to be Compensation. He indicated that about 40 or 50 people have already retired and received the benefit of the higher calculation. I believe that such a change could only be made prospectively and would only be permissible if it does not result in a disproportionate impact on lower paid employees (because of ERISA non-discrimination requirements). I do not believe that such a change would have a discriminatory impact in favor of highly compensation individuals but I would recommend that Human Resources consult Mercer Meidinger to verify that fact. If amounts received under the LTIP are to be excluded from "Compensation" for purposes of the Retirement Plans, the change may only be accomplished by amending the Retirement Plans' definition of "Compensation" to specifically list "amounts received pursuant to the Long Term Incentive Plan" as an item excludable under Section 1.7 or 1.8 of the Plans. Amendment of the Plans would require Board approval.

> It appears that making any such change by action of the Plan Administrator would not be appropriate under the regulations to Internal Revenue Code Section 411(d)(6). Those regulations prohibit pension plans from containing any discretionary provisions which affect the definite determination of benefits under a plan. The purpose of this requirement was to enable a plan beneficiary to know on the basis of the plan document itself what factors his or her benefits will be calculated upon, with nothing left to the sole discretion of the Plan....

> ... Should it be desired to eliminate those amounts from the definition of "Compensation," I would recommend that it be done by amendment to the Plan rather than by Plan Administrator action because of the legal restrictions which arise under the regulations to I.R.C. Section 411(d)(6).

Plaintiffs' Exhibit 11.

Green received the copy of Amelio's memorandum and thereafter provided a copy of it

to Schwass with a note asking Schwass to advise Green how Schwass wanted Green to proceed.[2] Green also sent a carbon copy of the memorandum to von Schack.

In a memorandum dated January 17, 1990, Bentz informed Green of the effects of including the LTIP compensation in the pension calculations of the participants who already had retired or were about to retire. Bentz estimated that "the total monthly cost for 10 employees" who had retired in 1989 or were going to retire in 1990 was $65.85 and "[t]he total present value of the promised benefit using the estimated life expectancy of each of the retirees is $6,942." Bentz further noted: "We will pursue this matter with legal and financial to determine what actions must be taken to exclude these earnings at the earliest possible date."

At a meeting in the spring of 1990 among various Duquesne Light executives, Terry Moten, an in-house lawyer at Duquesne Light, "discussed various approaches to excluding LTIP payouts from the definition of compensation" with the other officials present. Moten subsequently testified that he understood his assignment to encompass a determination of whether a plan amendment was the only way to exclude the taxable compensation recognized from the exercise of stock option and appreciation rights under the LTIP from the definition of "compensation." Moten suggested that outside counsel be retained because he did not understand the inner-workings between the Plans and § 411(d)(6) of the Internal Revenue Code. Thereafter, Duquesne Light retained outside counsel and requested an opinion as to whether the exclusion of the LTIP compensation could be done by the plan administrator or only by plan amendment.

Duquesne Light hired William Powderly III of Jones, Day, Reavis & Pogue. Powderly was paid by Duquesne Light for the services rendered. Powderly was asked to analyze the Plans and to make certain factual assumptions which generally corresponded to the background of the instant litigation, but he was not asked to nor did he provide an opinion which was based upon the instant evidentiary record.

Powderly noted in a memorandum letter that the plan administrator "has the power to 'determine from time to time pursuant to ... uniform and non-discriminatory rules,' whether extraordinary items of remuneration included in a W–2 should be excluded for the purpose of determining benefits under the plan." Powderly opined that the authority of the plan administrator and the plan sponsor were co-extensive. It was his opinion that if the plan sponsor could amend the plan without running afoul of § 411(d)(6) of the Internal Revenue Code, the plan administrator could act without violating that provision. Powderly further opined that with respect to taxable compensation from the LTIP exercises which were reported on any particular participant's W–2 for the 1989 year, such amounts were accrued benefits once the calendar year closed and could not be eliminated by either the plan administrator or the plan sponsor because of § 204(g) of ERISA and § 411(d)(6) of the Internal Revenue Code.

With regard to eliminating the LTIP income for the 1990 calendar year and beyond, Powderly warned:

[F]rom the standpoint of having to establish justification, the action of the plan administrator has the more tortious path. On the other hand, the actions of the sponsor will be subject to closer review concerning reduction in accrued benefits due to section 204(g) of ERISA (Sec. 411(d)(6) of the Code).

Powderly indicated that the "exposure" of eliminating the compensation earned pursuant to the exercise of the LTIP stock option and appreciation rights would be less if the action was taken by the Plans' administrator. He opined that the participants who received taxable income from the LTIP in 1990 prior to the announcement of a rule excluding such amounts by the plan administrator might be able to sue and win.

2. Schwass was an employee of Duquesne Light and had no fiduciary functions related to the administration of the Plans.

Powderly indicated that the Plans' administrator should undertake the following procedure in making an appropriate determination:

> You should be aware that there is a significant legal difference between the actions of the Plan Administrator in exercising its discretion as granted under the terms of the Plan and the Sponsor's discretion in exercising its retained power to amend or modify the terms of the Plan. In the first instance, the Plan Administrator is acting as a fiduciary and as such must exercise the discretion it has been specifically granted in matters such as the inclusion or exclusion of a particular item in compensation in conformity with law. Thus, exercise of such discretion should be in the sole interest of the participants and their beneficiaries and in accordance with the terms of the Plan, if such terms are not inconsistent with law. Based upon this principal, the Plan Administrator would be required to look closely at the type of income the Plan sponsor has indicated that is to be excluded, i.e., relocation expenses, travel pay and moving expenses. The Plan Administrator then must discern if the Sponsor would have considered the Incentive Plan Benefits in the same class as those which have been specifically excluded. The Plan Administrator should look at the time the Plan was established in determining the Sponsor's intent. If the answer to this is yes, the Sponsor would have excluded the benefits, the inquiry is ended. If the answer is either no or there is not sufficient information for the Plan Administrator to make the determination, then the Plan Administrator is faced with determining whether the inclusion or exclusion is good for the participants as a whole.

Plaintiffs' Exhibit 30 at p. 5.

Moten received Powderly's memorandum but did not distribute it to anyone at Duquesne Light. Moten expounded upon Powderly's work and issued a memorandum to

Bentz. Moten agreed with Powderly's opinion that the amounts received in 1989 as W–2 income from the LTIP could not be eliminated by action of the plan administrator because they were accrued benefits. Moten further opined that the amounts received in subsequent years could be eliminated by such action. Moten recommended that in making this determination the plan administrator "examine the items that were listed, the exclusions listed in the definition, and the language of such other extraordinary items, and [determine] whether [the plan administrator] believed that these long-term incentive plan payouts fit within those other extraordinary items."[3] Moten also reiterated that action by the Plan sponsor would be more closely scrutinized due to the nature and tax status of the Plans. Moten forwarded his opinion which indicated that a plan amendment would be more closely scrutinized under § 204(g) and (h) of ERISA to Green.

On June 5, 1990, Green issued the following memorandum to James W. Wilson, manager of the benefits department at Duquesne Light:

> It has been brought to my attention that monies received when eligible employees exercise their rights under the 1987 Long Term Incentive Plan have not been included as "... such other extraordinary items of remuneration ..." within the meaning of paragraph 1.8 of the Retirement Plan for Employees of Duquesne Light Company and paragraph 1.7 of the Supplemental Retirement Plan for Non–Represented Employees of Duquesne Light Company (collectively referred to as the "Plans"). Thus, these monies have been included as "compensation" in the pension benefit calculations under the Plans.

> Upon review of this matter, we requested and received an opinion of counsel. As Plan Administrator, it is my determination that monies received from the exercise of rights under the Long Term Incentive

---

3. Moten subsequently testified that his analysis did not include an assessment of whether the interest of the participants was part of the analysis the plan administrator had to take into account. He "simply provided advise as to what would be a proper analysis under both the plan administrator and the plan sponsor determination." Moten did not have a direct discussion with Green at this juncture.

Plan should never have been included in the pension benefit calculations under the Plans. Such monies are considered "... such other extraordinary items of remuneration ..." within the meaning of the Plans and are therefore not considered compensation as defined in the Plans. Thus, they are not be included in any future benefit calculations effective immediately.

This determination is not a modification of either Plan, it is simply intended to correct misapplication practiced since January 1989. Therefore, no notice to Plan Participants is required.

*See* Memorandum of Dianna Green dated June 5, 1990. Pursuant to the above memorandum, Green retroactively excluded the LTIP compensation which the participants who had not yet retired had received in 1989.

In making the above determination, Green did not consider or analyze the types of income the Plans identified as excludable. Green considered the intent of the drafters of the Plans to be irrelevant in determining whether the LTIP income should be excluded and made no effort to determine who drafted the plan provisions which she was interpreting because she was making a decision about stock option and appreciation rights which did not exist at the time the authors drafted the language in the Plans.

Green did not inquire as to whether the employees had received any previous information indicating that the LTIP income would be included in their pensionable earnings. Green was aware that the prior practice was to include the compensation from the exercise of stock option and appreciation rights in an employee's base income for calculating pension benefits. Green did not believe it was significant that the employees were told or led to believe that the compensation received pursuant to the LTIP exercises would be reported as W-2 compensation. Green did not review any documents that had been sent to the employees which characterized the LTIP program and explained to them how the program would work and why it was instituted. Green also did not consider the SPD which previously had been issued to the employees and indicated that the SPD was not relevant to her decision. Green further indicated that she did not believe that one of the purposes of a SPD is to provide participants with the information necessary to understand their retirement benefits and how they are calculated.

Green did believe that the Plans did not give her the authority to make a change in the meaning of the Plans without going to the Board and asking for a plan amendment, but she reasoned that "under my interpretation of my authority under the plan, any items that were not specifically expressed as being included or excluded" could be excluded as extraordinary remuneration. Green further opined that if it was the express intent of the company to include LTIP benefits in pensionable earnings at the time the LTIP was implemented, then the only way such items could be excluded was by plan amendment passed by the Board of Directors. When asked what the scope of the administrator's authority was to exclude income reported on an individual's W-2, Green indicated it was "those items that are not expressly listed in the plan, or those items that have not been previously determined or items which it is the duty of the plan administrator to determine under extraordinary items." Green's understanding of extraordinary items of remuneration was "those items that are not specifically included or specifically excluded." If they were not specifically addressed, her understanding was they were subject to her discretionary review.

Green did not inquire or consider whether her determination on the LTIP income had to be consistent with the items previously excluded pursuant to the definitional language in the Plans. She indicated that she was unaware of what imputed income derived from insurance premiums was or how such income was calculated or imputed. Green did not understand how or when the reimbursement expenses excluded in the definition of compensation would be reported on an individual's W-2. Green did not have knowledge of how the previous administrators had determined that other items not specifically excluded in the definitional language contained in the Plans properly were excluded. She further indicated that it was her under-

standing that relocation expenses, transportation-related payments, travel pay, and the like were excluded from an individual's compensation for calculating pension benefits even though the excluded items "may or may not be on [an employee's] W–2." Green further revealed that she did not do discrimination testing and did not inquire about whether the exclusion of the LTIP income by itself might violate the nondiscriminatory rules required for qualified tax treatment under the Internal Revenue Code. Green did not ask for tax advice about the definitions of income required for tax-favored treatment and the concomitant safe harbor rules which could be used to fashion an alternative definition that would continue to qualify for tax-favored treatment. *See, e.g.,* Plaintiffs' Exhibit 48, Advise of Lawrence J. Sher, F.S.A., to Wilson dated July 31, 1990 (indicating that the definition used in the Plans "comes closest to satisfying the W–2 safe harbors"; advising that deferred income could be excluded if all such forms of income were uniformly excluded; and indicating that in order to exclude the LTIP income all forms of stock option income would have to be uniformly excluded); *see also* Memorandums at Plaintiffs' Exhibit 85 authored by Duquesne Light's Human Resources Unit (indicating that all forms of earned income should be included and that income from reimbursement expense and other forms of unearned income as well as one time incentive pay deferred until after retirement should be excluded).

Green did receive and consider information about the actuarial impact on the funding of the Plans with the inclusion of stock option and appreciation rights exercised pursuant to the LTIP and believed that the inclusion of such items would have an impact of several million dollars, that the Plans were not specifically funded for the inclusion of the LTIP income and that inclusion would favor highly compensated employees. Green read the definitional language in the Plans and also reviewed the legal opinion issued by Amelio in making her decision. She orally consulted with various staff members during the undertaking designed to determine whether she could exclude the LTIP income. She considered Bentz's opinion which indicated that nothing in the documents pertaining to the implementation of the LTIP indicated that a specific determination had been made about whether the LTIP income was to be included under the Plans and that the Plans vested discretionary authority in the administrator to exclude other extraordinary remuneration reflected in an employee's W–2 income.

Green also held the position of vice president of administrative services at Duquesne Light. In this capacity Green received incentive compensation based upon the company's bottom-line yearly performance. Her incentive compensation included a 30% cash award over her annual salary of $156,000 plus stock options which vested at 30% per year in the first two years and 40% in the third year. Pursuant to a separate long-term incentive compensation plan applicable to Green and others, the company set aside in 1991 20,000 shares of stock of which she earned 30% in one year, 30% in year two and the remaining 40% in the third year. Green was permitted to defer the compensation under this incentive program until retirement or termination. For each cash incentive award she received annually or stock option which was not deferred until retirement or termination, Green understood this type of award to be included in her pension earnings. Green had never excluded these amounts under this separate incentive program as extraordinary items of renumeration.

### Contentions of the Parties

Count One of plaintiffs' amended complaint is based upon the plain language of the Plans, the SPD of the Plans and other information about the Plans provided to plaintiffs prior to and during the relevant time period. Plaintiffs contend that the language of the Plans and the concomitant language of the SPD clearly indicate an intent by the settlor to include the type of income received pursuant to the LTIP in calculating pension benefits. Plaintiffs note that no document was ever distributed to the plan participants which indicated that the LTIP compensation would be excluded from compensation. Plaintiffs argue that under the doctrine of *ejusdem generis,* it is clear that the settlor's intent was to include items like the LTIP compensation in the definition of compensa-

tion because the definition was inclusive and the income received pursuant to the exercise of stock option and appreciation rights under the LTIP was not in any way similar to the types of reported W–2 income which the Plans excluded from compensation for pension benefits. Plaintiffs contend that because no class member ever received a copy of the June 5, 1990, memorandum authored by Green, the terms of the Plans and the SPD remained unchanged until the March 1, 1994, amendment to the Plans and accordingly plaintiffs are entitled to have their retirement benefits calculated pursuant to the terms of the Plans as written.

In support of their contention, plaintiffs assert that a plan administrator cannot secretly change the basis for payment of benefits to participants under the terms of a defined pension plan in light of the fact that ERISA requires an employee benefit plan to "specify the basis upon which payments are made ... from the plan." 29 U.S.C. § 1102(b)(4). Plaintiffs also note that in order to be a qualified pension plan, the plan must provide "definitely determinable" benefits. *See* Treasury Reg. § 1.401–1(b)(1)(i). Plaintiffs contend that if an administrator had the ability simply to pick and choose among the various types of reported W–2 income, the plan would violate ERISA's requirement "that a plan be maintained in a written document and that any written plan, no matter how informal, can never be modified orally and without prior notice to affected participants."

Defendants contend that the exclusion of the LTIP income was within the discretionary authority granted to the plan administrator and that the plan administrator properly exercised her discretion in excluding the LTIP income under the present circumstances. Defendants contend that under the language of the Plans the "true meaning of that which constitutes 'compensation' is remuneration or pay for services, not the non-reoccurring or extraordinary amounts received by an exercise of the stock option or

[stock appreciation rights] which happens to be reflected in a W–2 statement." Defendants assert that income reflected in a W–2 must be limited to that which an employee receives each pay period to meet living expenses. Defendants characterize the LTIP income as a non-reoccurring item of income and accordingly an extraordinary item of income.

Defendants further argue that the SPD provided to the employees was sufficient to meet the applicable disclosure requirements under ERISA because such statements were not required to anticipate every contingency that might arise with regard to the calculation of a particular participant's benefits. Defendants argue that the SPD put plaintiffs on notice that what was to be included in calculating pension benefits was actual pay or compensation for the performance of job duties. Defendants further note that the United States Court of Appeals for the Third Circuit has ruled that "an inaccurate summary plan description cannot provide a basis for equitable estoppel, at least in the absence of 'extraordinary circumstances.'" *Gridley v. Cleveland Pneumatic Co.*, 924 F.2d 1310, 1319 (3d Cir.), *cert. denied,* 501 U.S. 1232, 111 S.Ct. 2856, 115 L.Ed.2d 1023 (1991).[4] Relying on *Gridley,* defendants assert that a violation of a procedural requirement under ERISA does not give rise to a substantive remedy.

With regard to the language of the Plans, defendants assert the following:

The items specifically listed as exclusions under the plans have one (and just one) common element: they are all payments of benefits to employees which go beyond regularly stated yearly salary or normal pay. They are "extras" or "fringes." They are not recurring items of compensation. They are items which are very clearly income as far as the IRS is concerned, yet which just as clearly would artificially inflate a person's pension in a grossly unfair manner. The items constitute ex-

---

**4.** In *Gridley,* plaintiff asserted that a summary plan description was defective because it did not contain all of the information that is required under ERISA. The plaintiff asserted that she was entitled to a substantive recovery because

the lack of information rendered the summary plan description misleading. The court held that the elements of estoppel must be present in order to recover for the technical deficiency which the plaintiff had identified.

traordinary remuneration. For example, no reason exists for a person who has traveled and received mileage and meal expenses to obtain a higher pension than someone who was paid the same but did not travel. Similarly, highly compensated employees who received stock options or stock appreciation rights could reap a second large benefit beyond the actual stock option or stock appreciation right to the disadvantage of those who did not receive them.[5]

Defendants further assert that under a qualified defined benefit pension plan, the plan need not disclose all the specific circumstances surrounding the various provisions contained in it because a plan must be permitted under law to remain sufficiently flexible to allow for changes with regard to new items that arise and which were not contemplated by the settlor. In this regard, defendants contend that a detailed listing of every possible requirement and exclusion in the SPD would be wholly impractical. Accordingly, defendants contend that the language of the Plans grant the administrator broad authority to determine whether any specific item reported on a W–2 would constitute extraordinary income and that Green properly exercised her discretion in excluding the LTIP income.

In response, plaintiffs argue that defendants' position is inconsistent with (1) the Plans' language, (2) the language of the SPD issued to plan participants, (3) the practice of including such income prior to June 5, 1990, and (4) Green's interpretation of the definition in the Plans. Plaintiffs contend that defendants' position demonstrates "the kind of employer activity that ERISA seeks to redress: manipulation of a tax-qualified trust to an employer's advantage in a way that frustrates employee expectations." *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1184 (3d Cir. 1992).

Plaintiffs also elaborate on their contention that the administrator's interpretation and retroactive exclusion of the employees' W–2 income was outside of the narrow scope of exclusions set forth in the Plans. Plaintiffs argue that the language in the Plans indicates that all compensation for work effort is to be included and what is to be excluded is income from expense reimbursement or imputed income and that the LTIP income is not similar in any way to expense reimbursement or imputed income. Plaintiffs note that the SPD informs the employees that compensation goes beyond normal yearly salary and includes overtime, shift premiums, gratuities and other payments reported on an individual's W–2. The plaintiffs further note that under the Plans the employees' income from suggestion awards, service bonus awards, nuclear bonuses, instructor fees, slogan awards and other non-recurring payments beyond yearly salary or base pay traditionally had been and continued to be included in calculating pensions benefits. Plaintiffs contend that defendants' assertion that the term compensation is to be limited to "non-recurring items" simply is unsupported by the definition in the Plans and the previous practice of those in charge of administering them. Plaintiffs further note that Green's assessment did not even include an analysis of whether "non-recurring" items of income were subject to exclusion.

Count II of plaintiffs' amended complaint alleges that defendants effectuated a material change in the definition of compensation and attempted to reduce prior accrued benefits in a manner inconsistent with 29 U.S.C. § 1054(g). Plaintiffs further contend that the utilized procedure failed to provide proper notice of a plan amendment pursuant to 29 U.S.C. § 1054(h). Plaintiffs assert that Green's decision of June 5, 1990, was a *de facto* amendment to the Plans and because defendants failed to properly amend the Plans prior to March 1, 1994, and failed to provide proper written notice to plaintiffs more than fifteen days prior to the effective date of Green's June 5, 1990, amendment, the attempt by Green to exclude the LTIP stock option and appreciation income was void *ab initio*.

---

**5.** As previously noted, the LTIP was designed so that the employees only recognized income at the time they exercised their rights thereunder. Therefore, there was no "second large benefit" to reap.

In support of Count II the plaintiffs note that defined benefit plans are dependent upon the compensation of the participant received during a particular period and that the definition of compensation is critical in calculating the rate at which a participant's benefits accrue. Plaintiffs contend that the concept of "accrued benefits" is the line drawn between employer flexibility and employee expectations. Plaintiffs argue that because pension plans are subject to participation, vesting and funding, Green's decision as of June 5, 1990, to retroactively exclude the income from the exercise of stock option and appreciation rights was contrary to law and all participants' retirement benefits as of January 1, 1990, had to include in the participants' compensation the amounts received from the exercise of their stock option and appreciation rights and reported in their W–2. Plaintiffs also assert that because Green's June 5, 1990, decision failed to comply with § 1054(h), the purported amendment was ineffective and accordingly the plaintiffs are entitled to the inclusion of all income from the exercise of their stock option and appreciation rights up to March 1, 1994.

In response, defendants contend that the practice of excluding the LTIP income from pension benefit calculations did not result from a plan amendment, *de facto* or otherwise. Defendants assert that Green's memorandum of June 5, 1990, constituted an exercise of appropriate discretionary authority under the Plans and simply was intended to correct a mistake in practice which had inadvertently developed.

Count III of plaintiffs' amended complaint alleges that Green breached her fiduciary duty in excluding the LTIP income. Plaintiffs assert that Green did not perform her duties as plan administrator in good faith and with the best interests of the beneficiaries in mind.

Defendants assert that ERISA does not permit damages to be recovered against a plan administrator, that Green fulfilled her fiduciary duties in deciding to exclude the LTIP income from the definition of compensation and that Green had no duty to notify the plaintiffs of her decision and disclose the change in practice which she effectuated in her June 5, 1990, internal memorandum.

*Analysis*

 The parties' submissions pursuant to the instant cross-motions for summary judgment raise the issue of the appropriate standard of review. The Supreme Court recently addressed the issue of the degree of deference due ERISA plan administrators in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The *Bruch* Court held that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Bruch,* 489 U.S. at 115, 109 S.Ct. at 956. If the plan vests such discretion in the administrator, the decision is to be reviewed under the more deferential arbitrary and capricious standard of review. *Id.; see also Luby v. Teamsters Health, Welfare & Pension Trust Funds,* 944 F.2d 1176, 1180 (3d Cir.1991) (whether plan administrator's exercise of power is mandatory or discretionary depends upon the terms of the plan). The determination of whether a plan grants the administrator discretionary power to construe its terms is dependent upon the principles of trust law and the settlor's intent as expressed in the instrument. *Id.* ("The terms of trusts created by written instruments are 'determined by the provisions of the instrument as interpreted in light of all the circumstances and such other evidence of the intent of the settlor with respect to the trust is not inadmissible.'") (citing *Firestone,* 489 U.S. at 112, 109 S.Ct. at 955 and quoting Restatement (Second) of Trusts § 4, cmt.d (1959)); *Heasley v. Belden & Blake Corp.,* 2 F.3d 1249, 1256 (3d Cir. 1993) (where plan language grants discretionary authority to administrator further inquiry is not necessary and administrator's determination is to be reviewed under deferential arbitrary and capricious standard of review).

 In *Bruch,* the Supreme Court also addressed how an allegation of a conflict of interest is to be factored into the analysis

and noted that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Bruch,* 489 U.S. at 115, 109 S.Ct. at 957 (*quoting* Restatement (Second) of Trust § 187 comment d (1959)). In other words, the presence of a conflict of interest does not change the standard of review. It is, however, an important factor to be considered in applying the standard of review. *See Daniels v. Anchor Hocking Corp.,* 758 F.Supp. 326, 330 (W.D.Pa.1991) ("We believe that a more accurate interpretation of *Bruch* leads to the conclusion that the alleged conflict of interest becomes a *factor* to be considered and given some weight during the reviewing process, rather than changing the substantive nature of the review itself."). As the *Daniels* court noted, "the clear import of [the language used by the Supreme Court in *Bruch*] is that the terms of the plan document, rather than a possible conflict of interest, controls the standard of review." *Id.* Likewise, allegations of bad faith do not change the applicable standard of review. Instead, such allegations are an additional factor to be considered in determining whether there has been a wrongful denial of benefits under an ERISA plan.

The language contained in the instant Plans grants the administrator the discretionary authority to determine whether other "extraordinary" items not specifically excluded from the definition of compensation are similar to the delineated categories of exclusions set forth therein and within the scope of those types of items the settlor intended to exclude. The language of the Plans grants the administrator discretionary authority to determine whether an *item of remuneration* is extraordinary and similar to the extraordinary situation where an employee recognizes reportable W–2 income from the receipt of money for transportation mileage, relocation expenses, meal allowances or imputed income from insurance payments. The SPD further demonstrates that the employees were made aware of the fact that the administrator could exclude similar extraordinary payments to those set forth in the definition of compensation by indicating that

"compensation does not include amounts attributable to transportation mileage, relocation expenses, meal allowances, imputed income from insurance payments *or similar extraordinary payments....*" In addition, the SPD informed the participants that the plan administrator had the overall responsibility for the operation of the Plans and the authority to construe and control the administration of the Plans. Likewise, the Plans granted to the administrator the discretionary authority to construe the plan. In light of this discretion, Count I of plaintiffs' complaint seeking relief pursuant to the plain meaning of the language contained in the Plans does not provide a separate substantive basis for relief and the contentions raised thereunder must be analyzed pursuant to Counts II and III of the amended complaint. *See Wildbur v. ARCO Chemical Co.,* 974 F.2d 631, 637–38 (5th Cir.1992) (where plan gives administrator discretionary authority to construe plan, an interpretation challenged under the plain meaning of the language is to be analyzed under the arbitrary and capricious standard; the assessment of whether the administrator gave the plan a uniform construction and a fair reading are factors to be taken into account under the deferential standard of review).

Pursuant to Count II, plaintiffs seek partial summary judgment with regard to the exercise of their stock option and appreciation rights occurring in 1989. Plaintiffs assert that under § 204(g) of ERISA, the administrator's decision of June 5, 1990, constituted a *de facto* amendment to the Plans or at a minimum constituted an exercise of discretion which attempted to retroactively eviscerate accrued benefits. Plaintiffs further contend that the administrator's June 5, 1990, decision likewise ran afoul of § 204(h) of ERISA because it constituted an amendment to the Plans and resulted in a significant reduction in the rate of future benefit accrual without the appropriate notice required under that statutory provision.

ERISA was designed to promote the interests of employees and their beneficiaries in employee benefit plans. *Nazay v. Miller,* 949 F.2d 1323, 1329 (3d Cir.1991). ERISA's primary concern is with the administration of

benefit plans and not with the precise design of a plan. The primary purpose of the statute is to insure that an ERISA plan is properly executed and administered once it has been established by the sponsor. *Id.* at 1329; *see also Haberern v. Kaupp Vascular Surgeons Ltd. Defined Benefit Pension Plan,* 24 F.3d 1491, 1498 (3d Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1099, 130 L.Ed.2d 1067 (1995). By requiring employee benefit plans to be established and maintained pursuant to a written ERISA instrument, Congress promoted ERISA's goal of assuring that "every employee may, on examining the plan documents, determine exactly what his rights and obligations are under the plan." *Hamilton v. Air Jamaica, Ltd.,* 945 F.2d 74, 77 (3d Cir.1991), *cert. denied,* 503 U.S. 938, 112 S.Ct. 1479, 117 L.Ed.2d 622 (1992) (citing *Hozier v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1163–64 (3d Cir.1990)).

■■■■ ERISA requires that a qualified pension benefit plan "specify the basis upon which payments are made ... from the plan." 29 U.S.C. § 1102(b)(4). In order to become a qualified pension plan, the plan itself must provide "definitely determinable" benefits. *See* Treasury Reg. § 1.401–1(b)(1)(i). Unlike other plans falling within the scope of ERISA, defined benefit plans are subject to vesting, funding and participation requirements established pursuant to ERISA and the Internal Revenue Code. *See, e.g., Berger v. Edgewater Steel Co.,* 911 F.2d 911, 914 (3d Cir.1990), *cert. denied,* 499 U.S. 920, 111 S.Ct. 1310, 113 L.Ed.2d 244 (1991). The benefits under a defined benefit plan "are not dependent upon the current or future assets of the plan. The employer must provide a 'defined benefit' to the plan participant upon retirement, termination or disability, [*Chait v. Bernstein,* 835 F.2d 1017, 1019 n. 7 (3d Cir.1987) ], and the employer must satisfy shortfalls if the actuarial assumptions of the plan prove incorrect." *Malia v. General Electric Co.,* 23 F.3d 828, 830–31 n. 2 (3d Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 377, 130 L.Ed.2d 328 (1994). Like-

wise, an excess in the assets of a defined benefit plan "typically accrues to the employer's benefit by reducing the out-of-pocket contribution the employer must make to maintain required funding levels for the present value of the defined benefits." *Id.*

■■■ ERISA defines an accrued benefit in the case of a defined benefit plan as "the individual's accrued benefit determined under the plan, and, except as provided in section 1054(c)(3) of this Title, expressed in the form of an annual benefit commencing at normal retirement age...." 29 U.S.C. § 1002(23)(A). ERISA further provides that "the accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(c)(8) or 1441 of this Title." 29 U.S.C. § 1054(g)(1). It follows *a fortiorari* that an accrued benefit may not be retroactively decreased through the purported exercise of an administrator's discretion.

■■■ In the instant matter, the administrator did not attempt to exercise any purported discretion to exclude the LTIP income generated from the stock option and appreciation rights prior to June 5, 1990. Because the language contained in the Plans defining compensation was inclusive rather than exclusive and specifically encompassed the type of income recognized upon the LTIP exercises, it follows that those employees which exercised their stock options and appreciation rights in 1989 and had income reported on their W–2's for the calendar year of 1989 acquired an accrued benefit.[6] Accordingly, plaintiffs are entitled to partial summary judgment on this aspect of the claim set forth in Count II.

Plaintiffs also move for summary judgment as to all LTIP income realized during the calendar years of 1990 up to March 1, 1994. Plaintiffs contend that Green's June 5, 1990, internal memorandum was in effect a *de facto* amendment and that the failure to provide timely notice under § 1054(h) entitles them to relief. That section provides:

**6.** *See* the definition of compensation, *supra,* at 885–886 and the analysis of that definition, *infra,* at 899.

A plan described in paragraph (2) may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the Plan Administrator provides a written notice, setting forth the plan amendment and its effective date to—

(A) each participant in the plan. . . .

29 U.S.C. § 1054(h)(1)(A).

In *Davidson v. Canteen Corp.*, 957 F.2d 1404 (7th Cir.1992), the court considered whether a company's failure to provide its employees with advanced notice of a change in the definition of compensation in a retirement plan violated § 1054(h). The plan defined compensation for calculating pension benefits as the employee's "annual W–2 earnings." The defendant sought to exclude from that definition the exercise of stock option and appreciation rights. The sponsor purportedly had amended the plan, but had failed to provide notice to any participants reflecting its intent to exclude from the definition of compensation any income resulting from the company's stock option plan. A number of employees exercised their stock options and subsequently retired. The amount of compensation from the exercise reported on the employees' W–2 was not included in calculating their pension benefits. The employees had received oral notice of the amendment prior to exercising their stock options, but contended that the oral notice was ineffective. The court agreed and concluded that the attempted modification without proper notice denied the employees "what section 204(h) requires: the opportunity to take advantage of an existing benefit before it is lost." *Id.* at 1407.

Other courts have considered whether various changes in the interpretation of language contained in a defined benefit pension plan constituted an amendment within the meaning of § 1054(h). In *Production and Maintenance Employees' Local 504 v. Roadmaster Corp.*, 954 F.2d 1397, 1400 (7th Cir. 1992), the defendant adopted an amendment which sought to retroactively exclude the accrual of benefits. The defendant posted notice of the amendment on the plant bulletin boards and subsequently sent a letter to the employees' union. The court held that the notice on the bulletin board and the letter to the union failed to comply with either § 1054(g) or (h) and thus the employees' benefits continued to accrue. Two years later the defendant issued a "clarification" to the amendment which purported to make the effective date three days after the original amendment was purportedly adopted. The defendant did not give the employees notice of its subsequent clarification of the original amendment's effective date. The court held that the subsequent "clarification," like the original amendment, was another attempt to retroactively reduce accrued benefits and to amend the plan as to future accrual without proper notice. The clarification violated § 1054(h) and (g) and was likewise ineffective.

In *Pickering v. USX Corp.*, 809 F.Supp. 1501 (D.Utah, 1992), the court held that the resulting change in the language of a pension plan was an amendment even though the defendant never labeled the change as an amendment, a clarification, a modification or anything else. USX had entered into "the June agreement" which made another company a subsidiary under USX's 1987 pension agreement. Under the June agreement, the years of service with the subsidiary differed significantly from the language of the original pension agreement. The court found that USX had "amended the 1987 pension agreement within the scope of ERISA § 204(h), which governs such an amendment." *Id.* at 1562. The court indicated that it is not the characterization of the alleged action taken by the administrator or sponsor which governs; instead, it is the substantive effect of the action taken.

In assessing a transaction to determine whether a merger between the two corporations effectuated an amendment to a pension plan, Judge Ditter summarized the relevant caselaw under § 1054(h) as follows:

As the caselaw shows, a change in the terms of a pension plan, however the change was effected or termed, can be an amendment of the plan under § 1054(h), whether implemented as a plan amendment explicitly (*Davidson*), a "clarifica-

tion" (*Production and Maintenance Employees' Local 504* ), part of a sales agreement (*Pickering* ), or, as in *Gulf Pension Litigation* and the instant matter, a plan merger.

*Koenig v. Intercontinental Life Corp.,* 880 F.Supp. 372, 374 (E.D.Pa.1995).

■■■ The instant action taken by the plan administrator resulted in a significant change in the interpretation of the language contained in the Plans and thus constituted an amendment. The definition of compensation used in the calculation of pension benefits was inclusive and encompassed all forms of compensation reported to the IRS on the employee's W–2. Excluded from the definition was imputed income within the meaning of 26 U.S.C. § 843, unearned income and unanticipated income from the receipt of expense reimbursement. The language draws a distinction between all earned income which the company could anticipate the employees receiving for services rendered, by whatever means or program, including bonuses and incentive pay, and that which was not in any way contemplated by the employer (imputed income from the receipt of money which was allotted for ordinary and necessary business expenses) and extraordinary fringe benefits which were in excess of ceiling limits under the Internal Revenue Code.

In addition, several of Duquesne Light's high-ranking employees in the human resources and benefits departments previously had interpreted the plain meaning of the language to include the type of benefit under consideration and had calculated other employees' pensions pursuant to that construction. The SPD likewise clearly indicated that the type of compensation under consideration would be included in the calculation of pension benefits. In light of the inclusive language used in the Plans and the concomitant practice which had developed thereto, it is not surprising that defendants have failed to identify any similar merit-based compensation program or bonus program which was treated similarly under the Plans' exclusionary language. Thus, Green's June 5, 1990, memorandum constituted a material change in the construction of the language under consideration. Accordingly, the result sought to be achieved falls squarely within § 1054(h).

■■■ Section § 1054(h) mandates that notice be given after the adoption of an amendment that significantly reduces future benefit accrual but "not less than 15 days before the effective date of the plan amendment." The June 5, 1990 memorandum was not published or provided to the employees at any time prior to its purported application to the calculation of the employees' pension benefits. Accordingly, no notice was given and the June 5, 1990, memorandum denied the employees their statutory right to prior notice of a substantive amendment and an opportunity to take advantage of the accrual prior to its cessation.

■■■ Finally, § 1054(h) requires that the reduction be significant. The record demonstrates that the impact on the benefit calculations was significant. The plaintiffs' exercise of LTIP rights resulted in income ranging from $7,155 to $42,287. The resulting additional pension benefits from the inclusion of these exercises ranges from $692 to $4,188 per year. Americo DiCioccio, for example, received $10,127.91 from his exercises and would receive additional pension benefits of $1,679 per year. Albert J. Bartosh received $15,247.86 from his exercises which would result in an increase of yearly benefits in the amount of $1,663.00. Ralph Stidham received $16,702.60 from his exercises and would receive additional pension benefits of $2,047 per year. Thus, the reduction was significant.

In short, the June 5, 1990 memorandum attempted to effectuate a substantive change in the interpretation of the language contained in the Plans. It constituted a *de facto* amendment within the meaning of § 1054(h). This change resulted in a significant reduction in the rate of future benefit accrual and the participants were not provided with the notice that § 1054(h) requires. Plaintiffs' motion for summary judgment on Count II of the amended complaint will be granted.

■■■ The record also demonstrates that the administrator abused her discretion in administering the Plans. Where a plan administrator's interpretation of the terms of

the plan are in dispute and the plan provides the administrator with the authority to interpret the plan, a court's analysis of whether there has been an abuse of discretion involves a two-step inquiry. *Wildbur v. ARCO Chemical Co.,* 974 F.2d 631, 637 (5th Cir. 1992). The first area of inquiry is whether the administrator has rendered a legally correct interpretation of the plan. Assuming the administrator did not give the plan a legally correct interpretation, the court also must determine whether the facts and circumstances giving rise to the decision are sufficient to establish an abuse of discretion.

■■■■ Three factors are pertinent in determining whether the administrator's interpretation of the plan was legally correct:

(1) whether the administrator has given the plan a uniform construction;

(2) whether the interpretation is consistent with a fair reading of the plan; and

(3) any unanticipated cost resulting from different interpretations of the plan.

If it appears that the administrator's interpretation is inconsistent with the operative language in the plan, the court must then determine whether the administrator abused his/her discretion. The following factors are important:

(1) the internal consistency of the plan under the administrator's interpretation;

(2) any relevant regulations formulated by the appropriate administrative agencies; and

(3) the factual background of the determination and any inferences of the lack of good faith.

*Id.* at 637–38. Where an administrator has given an interpretation which is in direct conflict with the express language, this action, while not dispositive, "is a very strong indication of arbitrary and capricious behavior." *Id.* at 638 (quoting *Dennard v. Richards Group, Inc.,* 681 F.2d 306, 314 (5th Cir.1982)). Likewise, "a wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all

participants and beneficiaries." *Wildbur,* 974 F.2d at 638 (quoting *Brown v. Blue Cross & Blue Shield of Alabama, Inc.,* 898 F.2d 1556, 1556–57 (11th Cir.1990), *cert. denied,* 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991)). In determining whether the administrator has given a uniform construction to the plan, evidence regarding other similar benefit determinations may be taken into consideration. *Id.*

■■■ As previously noted, the administrator's interpretation of June 5, 1990, placed a specific compensation program which was within a larger class of substantially similar forms of compensation outside the inclusive definition in the Plans and attempted to retroactively initiate a practice which was significantly different than that which had developed in the preceding years with regard to bonus pay or incentive pay programs similar to the LTIP. Although the defendants correctly point out that no evidence demonstrates that the administrator made a specific determination as to whether the income derived from the LTIP was to be included or excluded prior to June 5, 1990, it is clear that the practice which had developed during the time under consideration was opposite to the position which the administrator ultimately adopted. A number of high-ranking company employees involved in managing employee benefits had developed that practice because of the scope of the language contained in the Plans. While the prior practice is not binding on defendants and does not provide a foundation for liability based upon promissory estoppel, the interpretation is probative evidence of the meaning of the language used to define compensation in the Plans. Green's interpretation amounted to a construction which was beyond the limited exclusionary language set forth in the Plans and constituted a material change. In light of the previous practice which had developed pursuant to those individuals administering the Plans under the administrator's direction and the language contained in the Plans, the administrator's new interpretation was not uniform nor consistent with a fair reading of the Plans.

The factual background giving rise to the determination and the inferences of the lack of good faith are significant. First, Green

did not attempt to ascertain the Plans' sponsor's intent in determining whether the LTIP income should be included or excluded. She did not even attempt to ascertain how and under what circumstances the excluded items would result in reportable income on an employee's W–2, nor did she understand the conceptual distinctions delineated by the exclusionary language in relation to ordinary W–2 income. Instead of ascertaining the settlor's intent in light of the language used and the circumstances surrounding the creation of the Plans, Green attempted to justify her action on the basis that the employees were never told when the LTIP program was implemented that the resulting income would be included, an inquiry which is irrelevant to ascertaining the settlor's intent and the appropriate construction to be given to the language setting forth the administrator's limited discretion to construe the definition of compensation. Second, while Green was aware of the previous practice of including the LTIP income and similar incentive awards, she made no further inquiry as to how determinations regarding the other items listed in the SPD which were similar to those set forth in the exclusionary language had been made. Third, in making her decision she directly relied upon the following: that the Plans were not necessarily funded for inclusion and that inclusion might result in additional funding by Duquesne Light. It was in this context that she specifically requested her employer, Duquesne Light, to direct her on how to proceed. In addition, Green's annual incentive pay in her capacity as vice president of administrative services was based upon the company's bottom-line performance in administrative services. Fourth, while defendants strenuously argue that she considered additional outside material and memorandum issued by counsel, Green's deposition testimony reveals that she consulted very little in making the ultimate

determination: she simply propounded her own explanation of the exclusionary language contained in the Plans as justification for her decision and then further attempted to retroactively apply that decision without providing the participants with any notice of the new interpretation.

Green's actions were contrary to the "legal" advice which was available to her and which she allegedly relied upon in rendering her decision. Not only was Green's decision contrary to the advice the various department officials had rendered, Green's decision to single out in a discriminatory fashion a specific compensation program without uniformly treating other similar incentive and deferred compensation programs was contrary to the tax advice available to her and contrary to the tax advice used to formulate the tax-qualifying definitions.

■ The purported justification for the exclusion in essence reduces to three propositions: (1) the Plans were not necessarily funded for the inclusion, (2) the employees who were granted the LTIP options were never provided with notice that the exercise of the same would be included in their pension benefit calculations, and (3) certain high-ranking Duquesne Light officials believed that inclusion of the LTIP income would grossly distort a participant's benefits. Denying a benefit on the basis that providing it might have an impact on the plan sponsor and that the sponsor might have to correct the deficiency is an insufficient basis for justifying the discriminatory treatment of a group of participants. Defendants' assertion that the interpretation was necessary to preserve the corpus to pay intended benefits also falls short of the mark under the circumstances: the benefit to the entire class was illusory.[7] Similar merit-based incentive programs were not uniformly and non-discrimi-

---

7. Green did not know whether the financial impact on the Plans had ever been considered in determining whether any other item of renumeration was extraordinary. Plaintiffs have documented that the Plans were funded sufficiently due to actuarial valuations which included gains for projected salaries and salary increases during the years 1985 through 1987, the years when no merit-based salary increases were given due to Duquesne Light's financial difficulties. The

Plans also had a positive investment return during the years prior to 1990. In April of 1990, the Plans were approaching the point where tax deductible contributions would be reduced or even eliminated due to the Plans' funding status. Thus, defendants contention that Green acted to the benefit of the entire class of beneficiaries in preserving "the trust corpus to pay the benefits it was intended to pay" is at best disingenuous.

natorily excluded. In light of the absence of further justification for the exclusion of the LTIP income under the language contained in the Plans, defendants have failed to support their contention that the exclusion sufficiently benefited the class as a whole. Under the circumstances, an abuse of discretion has occurred.

Defendants' reliance upon the unreported case of *O'Neil v. Retirement Plan for Salaried Employees of RKO General, Inc.*, 37 F.3d 55 (2d Cir.1994), is misplaced. There, the stock incentive compensation plan was specifically designed to provide additional income after retirement or termination and not to provide pay given for merit-based performance and in lieu of a salary raise because of the financial condition of the company. The plan under consideration defined "earnings" as "regular salary." Because earnings were limited to "the regular salary" paid to a participant during the calendar year, the deferred vesting of the stock option plan did not fall under the definition of earnings.

Moreover, in upholding the district court's determination that the committee's decision to exclude the stock option and appreciation rights was not arbitrary and capricious, the appellate court upheld the district court's determination that regular salary during the calendar year was limited to normal and recurring types of compensation paid for and/or directly related to services rendered. The committee further considered the intent, history and prior interpretations of the plan and the various types of earnings which traditionally had been excluded under that definition. Stock option and incentive rights had never been included in calculating pension benefits. Although the defendants' practice of including other irregular payments in earnings supported plaintiffs' argument, the court recognized that the practice was only a factor to be considered. Likewise, the court found that the committee's reliance upon the funding of the plan, which actually supported the plaintiffs' position because the funding was adequate to cover the additional pension benefits, was not dispositive. The court also found defendants' arguments that the executives could manipulate their pension benefits based upon the year of their exercise was an insignificant concern, but further noted that the minimal ability to manipulate their overall compensation through the exercises further supported the committee's decision. Although the court rejected the defendants' arguments that inclusion of the stock option and appreciation rights might discriminate in favor of highly compensated individuals in the qualified plan under the Internal Revenue Code, the district court had determined that the committee relied upon the received tax advice in good faith and the risk of disqualification, even though not substantial, was at least a factor the committee could consider. Because the definition of earnings was limited to regular salary during the calendar year and the stock option and appreciation rights program was implemented specifically to provide supplemental retirement income, the court affirmed the district court's determination that the administrative committee had not abused its discretion in excluding the stock option income.

In the instant action, the LTIP was implemented specifically as a merit-based salary increase because management and professional employees had not received any raises for three years. The company could not afford to provide salary increases at that particular time and designed the program to defer the compensation into subsequent years. It was inescapable that the deferral of that income would raise the participants' reported income when the LTIP rights were exercised and that the amount of the pay raise would depend upon the increase in value of Duquesne Light's stock. The compensation specifically was designed for services rendered and constituted ordinary W–2 income and as such fell squarely within "compensation" as defined in the Plans.

Defendants' contention that the inclusion of the LTIP exercises would disqualify the Plans from their sheltered tax status is likewise misplaced. If anything, the specific singling out of the LTIP program as compared to all other incentive-based bonus and deferred compensation programs would be an act subject to review under the discriminatory provisions of 26 U.S.C. § 411. The plan remained neutral in what was to be included in compensation. The inclusive definition

was chosen to provide the Plans with a definition which assured its tax sheltered status. It is apparent that Green did not consider the available tax advice. Accordingly, plaintiffs are entitled to judgment on Count III.

### The Subclass Allegations at Count IV

A subclass of plaintiffs (approximately 32 retirees) challenge the defendants' calculation of benefits under the Supplemental Plan. On March 13, 1995, the following subclass was certified:

> All members of the class who retire before the date of judgment whose accrued benefits calculated as of December 31 of the year proceeding the year of their retirement were greater than the benefits which they received under the Supplemental Plan at the date of their retirement.

Document No. 80 at 2.

The subclass plaintiffs allege that defendants impermissibly decreased their accrued benefits by calculating their pension benefits as follows: their salary for their last year of service was used pursuant to their highest five years of consecutive service (even though they only worked during the first few months of that year) and during that last year of service the social security wage base was increased as of January 1. Subclass plaintiffs complain that defendants should have calculated their benefits based on the higher of (1) the annual basis of completed years of service as of December 31 of the year prior to their retirement or (2) the inclusion of the total yearly salary for the last year of service in which the employee worked (the actual computation used).

Benefits under the Supplemental Plan are calculated as follows: the sum of 1% of average compensation—multiplied by the years of service; plus .8% of excess compensation—multiplied by years of service up to 27 years. The portion of the Supplemental Plan formula challenged is: 0.8% of the participant's excess compensation multiplied by the number of years of credited service up to 27 years. "Excess compensation" is defined as: "the excess, if any, of the participant's five year average compensation over his covered compensation." (Tab 4, Sec. 1.15). "Five year average compensation" is defined as:

"the highest average annual compensation for any five consecutive calendar years after 1971 and *ending with the year in which the participant's credited service ceases.*" (Tab 4, Sec. 1.16) (emphasis added). "Covered compensation" means: "the amount of five year average compensation which does not exceed the maximum average annual unadjusted "wage" (i.e. not indexed) for benefit termination purposes under the Federal Social Security Act for a person reaching age 65 in the year of the participant's termination of employment." (Tab 4, Sec. 1.9). Covered compensation is in essence the social security wage base for a given year. As a social security wage base increases, excess compensation decreases unless an offset is created by a corresponding increase in salary. Subclass plaintiffs argue that "if you perform the second component of the Supplemental Plan calculation on an annual basis rather than the date of retirement, you reach a different higher result for participants who retire in the early months of the year." Subclass plaintiffs assert that defendants calculated benefits according to the formula producing the lower amount and therefore chose "a method of performing the calculation which results in the loss of previously accrued benefits."

Subclass plaintiffs' position is based upon a regulation proposed by the Internal Revenue Service ("IRS") which never became final. In order to receive tax sheltered treatment as a qualified defined benefit pension plan, the plan itself must comply with 26 U.S.C. § 411(b)(1)(G) which provides in pertinent part:

> A defined benefit plan shall be treated not as satisfying the requirements of this paragraph [relating to benefit accrual methods] if the participant's accrued benefit is reduced on account of any increase in his age or service.

26 U.S.C. § 411(b)(1)(G). On November 15, 1988, the IRS issued proposed regulations at 26 C.F.R. § 1.401(*l*)–1(c) which indicated that benefits under a plan may not be decreased as a result of a participant's increased service or age. An example given was an increase in covered compensation. The proposed regulations were modified in September of 1991.

In April of 1993, the IRS re-proposed regulations under § 1.401(*l*)–1(b) which continued to refer to an increase in covered compensation as an impermissible decrease in accrued benefits:

> (b) *Relationship to other requirements....* Moreover, a plan may not adjust benefits in any manner that results in a decrease in any employee's accrued benefit in violation of section 411(d)(6) and section 411(b)(G) **(for example, as a result of an increase in covered compensation).** However, a plan does not fail to satisfy section 401(1) merely because, in order to comply with section 411, an employee's accrued benefit under the plan is defined as the greater of the employee's accrued benefit protected under section 411(d)(6) and the benefit determined under a strict application of the plan's benefit formula and accrual method. See section 401(a)(15) for additional rules relating to circumstances under which plan benefits may not be decreased because of increases in Social Security benefits. (Emphasis added).

In October of 1993, the IRS promulgated the final regulations which deleted the parenthetical reference to covered compensation. The preamble to those final regulations explained why the reference to covered compensation was deleted:

> The regulations provide that compliance with section 401(1) does not allow a plan to decrease any employee's accrued benefit in violation of section 411(d)(6) and section 411(b)(1)(G). *Commentators requested removal of the reference in the proposed regulations to an increase in covered compensation as an example of a decrease in accrued benefit.* They believe section 411 does not prohibit a decrease in accrued benefit resulting solely from an increase in covered compensation.
>
> After considering the comments, the Treasury and Service have determined that the regulations under section 401(1) are not the proper vehicle for addressing the correct application of section 411 to this situation. Accordingly, the reference to an in-

crease in covered compensation has been removed from the regulations, but no inference should be drawn from this revision as to the correct interpretation of section 411.

Subclass plaintiffs allege that defendants' method of calculating benefits under the Supplemental Plan violated the following section of ERISA:

> [A] defined benefit plan shall be treated as not satisfying the requirements of this paragraph if the participant's accrued benefit is reduced on account of an increase in his age or service.

29 U.S.C. § 1054(b)(1)(G); *see also* 26 U.S.C. § 411(b)(1)(G). Subclass plaintiffs also contend that the defendants' calculations amounted to an amendment which retroactively decreased accrued benefits in violation of 29 U.S.C. § 1054(g) and further allege that defendants failed to provide adequate notice in the SPD that the participant's benefits could be reduced by an increase in the social security wage base. Finally, subclass plaintiffs assert that Green had a fiduciary obligation to notify them that a change in the social security wage base might affect their benefits.

▬▬▬ Subclass plaintiffs' contentions are without merit. First, there is no provision in the Supplemental Plan itself which reduces benefits because of age or years of service. The participants' benefit calculations with regard to years of service are uniform and the Supplemental Plan does not require separate calculations once a participant has worked for a specific number of years or has reached a specific age. Second, no amendment has occurred. The provisions of the Supplemental Plan remained unchanged. It follows that § 1054(h) is inapplicable. Third, the SPD for the Supplemental Plan which remained available upon request adequately informed the participants that the social security wage base was a factor included in the calculation of benefits and further indicated to the participants that this variable changed whenever the rate was increased.[8] Accordingly, the Supplemental

---

**8.** The SPD for the Supplemental Plan explained:

The amount of the retirement benefit your receive depends on several factors including:

Plan and the available information about it provided notice to the participants of this variable and Green did not breach her fiduciary duties in failing to apprise them of the minimal increase gained by retiring prior to their chosen date. Fourth, although plaintiffs note that defendants anticipated calculating benefits at the higher rate of December 31 of the year preceding the participant's retirement and in fact calculated one participant's benefits pursuant to this formula, there is simply no evidence to support a claim of equitable estoppel under the circumstances.

Moreover, plaintiffs cannot establish a right emanating from the Supplemental Plan which entitles them to the higher calculation based on an artificial date of retirement, nor can they point to any violation of an actual statute or regulation. What subclass plaintiffs really complain about is a variable which was part of an integration/offset formula. A participant's benefits under the Supplemental Plan are in essence integrated with the participant's receipt of social security retirement benefits. In *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981), the Court addressed the issue of whether offsetting pension benefits by workers' compensation payments, where the payment compensates for bodily impairment that the employee suffered, is forbidden by ERISA's anti-forfeiture provisions. The Court held that the offset did not work a forfeiture and upheld the following IRS regulation:

> Nonforfeitable rights are not considered to be forfeitable by reason of the fact that they may be reduced to take into account benefits which are provided under the Social Security Act or under any other Federal or State law and which are taken into account in determining plan benefits.

o your age at retirement
o your average compensation
o your covered compensation
o your excess compensation
o your normal annual pension under the basic Retirement Plan
o your years of credited service
o the option form you have chosen

\* \* \* \* \* \*

Your *covered compensation* means the amount of your average annual earnings below

26 C.F.R. § 1.411(a)–4(a). The Court noted that a distinction exists between depriving a participant of vested benefits and defining the content and computation of a benefit that cannot be forfeited once it has vested. *Alessi*, 451 U.S. at 511, 101 S.Ct. at 1900. In support of its determination, the Court found "particularly pertinent" Congress' implicit approval of the use of an integration formula under which "benefit levels are determined by combining pension funds with other income streams available to the retired employees." *Id.* at 514, 101 S.Ct. at 1901. By precluding integration only as the "increases in Social Security and Railroad Retirement benefits *authorized* after ERISA took effect" and by authorizing the integration of federal benefits expressly mentioned in ERISA, the Court recognized that Congress "acknowledged and accepted [the general practice of integration], rather than [prohibited] it." *Id.* at 516, 101 S.Ct. at 1902 (emphasis added); *see also Dameron v. Sinai Hospital of Baltimore, Inc.*, 815 F.2d 975, 979–80 (4th Cir. 1987) ("We hold therefore that ERISA's forfeiture provisions and the plan itself bar the use of estimates of Social Security benefits to offset pension benefits which are not reasonably related to the actual level of Social Security benefits.").

Congress has now expressly approved of formulas which utilize an integration/formula based upon social security wage base in qualified plans by providing:

> A trust shall not constitute a qualified trust under this section unless under the plan of which said trust is a part—
>
> In the case of a participant or beneficiary who is receiving benefits under such plan ...
>
> Such benefits are not decreased by reason of an increase in the benefit levels

the maximum average annual unadjusted wage, as determined by Social Security in the year your retire. For your wage level, please refer to the current Social Security unadjusted wage table in the back of this booklet. As changes occur, you will receive an updated table.

\* \* \* \* \* \*

The SPD also included a chart of the wage base increase from 1981 forward with predictions through 2015.

payable under Title II of the Social Security Act or an increase in the wage base under Title II, if such increase takes place after September 2, 1974 or (if later) the earlier of the date of first receipt of such benefits or the date of such separation, as the case may be.

26 U.S.C. § 401(a)(15)(A). In other words, wage base increases appropriately are incorporated into integration formulas in defined benefit plans as long as the increase does not occur after the earlier of (1) the date the participant first receives benefits or (2) the date of separation. Accordingly, the formula in the Supplemental Plan is in compliance with the Internal Revenue Code and the variable has been recognized by Congress. It follows that the variable does not produce a forfeiture of accrued benefits. The Supplemental Plan was administered pursuant to its terms. Accordingly, summary judgment must be granted for the defendants on Count IV of the amended complaint.

*Other Matters*

 Defendants contend that Duquesne Light and Green are not proper parties to the instant litigation. Counts II and III request equitable relief against the Plans and their administrator and accordingly Green is a proper defendant. Furthermore, the equitable decree necessary to fashion appropriate relief for the causes of action set forth in Counts II and III will obligate Duquesne Light to fund any deficiency created by the violations of ERISA. Duquesne Light is a necessary party in order to assure complete relief. Duquesne Light has had an opportunity to be fully heard on all issues. Accordingly, Duquesne Light and Green cannot be dismissed from this action.

 Finally, plaintiffs seek attorney's fees and costs pursuant to 29 U.S.C. § 1132(g)(1) which provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." In *Anthuis v. Colt Industries Operating Corp.*, 971 F.2d 999, 1011 (3d Cir.1992), the court reiterated that the following five factor test is to be employed in determining whether a discretionary award of attorney's fees and costs should be entered:

(1) the offending parties' culpability or bad faith;

(2) the ability of the offending parties to satisfy an award of attorneys' fees;

(3) the deterrent effect of an award of attorneys' fees against the offending parties;

(4) the benefit conferred on members of the pension plan as a whole; and

(5) the relative merits of the parties' position.

*Id.* (citing *Ursic v. Bethlehem Mines*, 719 F.2d 670, 673 (3d Cir.1983)).

 Here, a balancing of the five factors justifies a discretionary award of attorney's fees and costs to plaintiffs. Defendants have the ability to satisfy an award of attorney's fees and costs. The administrator's failure prior to her decision to make an appropriate investigation or, indeed, even to rely upon the legal advice available which indicated that her action was inappropriate is apparent. Thus, the "offending parties' culpability" is significant. An assessment regarding the relative merits of the parties' positions and the benefit conferred on the members of the pension plan as a whole likewise supports an award of fees and costs. Furthermore, the need to create a deterrent effect by awarding attorney's fees is justified in light of the defendants' conduct.

The record does not contain sufficient information to compute the appropriate amount of fees and costs. Accordingly, the parties will be ordered to meet and engage in a good faith effort to settle this aspect of the case. Should the parties be unable reach an agreement, the parties shall submit a joint status report setting forth the matters as to which they agree and addressing the issues as to which they are unable to agree and a conference will be scheduled thereafter.

An appropriate order will be entered.

*ORDER OF COURT*

AND NOW, this 29th day of June, 1995, for the reasons stated in the opinion filed this day, IT IS ORDERED that:

1) Count I of the complaint be, and the same hereby is, dismissed;

2) Summary judgment as to Counts II and III of the complaint be, and the same hereby is, granted in favor of the plaintiffs (Document Nos. 55, 64);

3) Summary judgment as to Count IV of the complaint be, and the same hereby is, granted in favor of the defendants (Document No. 71);

4) Plaintiffs' request for a discretionary award of fees and costs be, and the same hereby is, granted; and,

IT IS FURTHER ORDERED that the administrator shall recalculate pension benefits under the Plans in conformity with this opinion and shall include in calculating benefits under the Supplemental Plan and the Retirement Plan income received by any participant from the LTIP exercises through February 28, 1994, if such income falls within a participant's applicable years of service under the Plans; and

IT IS FURTHER ORDERED that the payment of benefits from the Plans shall be made pursuant to the recalculations ordered above; and,

IT IS FURTHER ORDERED that Duquesne Light shall fund any deficiency created by the recalculations ordered above; and,

IT IS FURTHER ORDERED that counsel shall meet on or before July 18, 1995, and make a good faith effort to resolve all issues regarding the appropriate amount of fees and costs to be awarded to plaintiffs. If counsel are unable to reach an agreement as to the amount of fees and costs to be awarded, they shall submit a joint status report on or before July 25, 1995, setting forth all matters as to which they agree and addressing the issues as to which they are unable to agree.