**Merry HAMILTON, Plaintiff,**

v.

**PHARMACIA & UPJOHN COMPANY, Defendant.**

No. 4:97–CV–161.

United States District Court,
W.D. Michigan,
Southern Division.

March 26, 1999.

Thomas D. Geil, Geil, Smit & Kragt, PC, Battle Creek, MI, for Merry Hamilton, plaintiff.

William H. Fallon, Miller, Johnson, Snell & Cummiskey, Grand Rapids, MI, for Pharmacia & Upjohn Company, defendant.

### *OPINION*

QUIST, District Judge.

Plaintiff, Merry Hamilton ("Hamilton"), filed this action against Defendant, Phar-

macia & Upjohn Company ("Upjohn"), alleging a wrongful denial of coverage under an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 to 1461. The parties have filed cross-motions for judgment on the administrative record, the alternative to summary judgment in ERISA denial of benefits cases. *See Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir.1998).

### Facts

Hamilton began working at Upjohn in 1978. In 1991, she became disabled with a work-related condition later diagnosed as "reflex sympathetic dystrophy." Hamilton was covered as an employee under the Upjohn Absence Payment Plan ("Plan").

The Plan includes four different classifications of qualifying disabilities. An employee is covered under the Plan if he or she suffers from a physical or mental impairment that prevents gainful employment:

1. Temporarily at Upjohn; or
2. Permanently at Upjohn ("Upjohn-only disability" "Long Term Disability" or "LTD"); or
3. Temporarily anywhere; or
4. Permanently anywhere ("Permanent and Total Disability" or "PTD").

(Plan at 7, Pl.'s Ex. 1.)

### A. Temporary disabilities

Temporary disabilities (categories 1 and 3) involve absences for more than three consecutive weeks and require the claimant to submit an extended sick leave authorization. (*See id.* at 11.) In order to make a claim for temporary disability, the employee must have a Lost-time Report approved by her supervisor, payment under which must be authorized by Corporate Benefits. (*See id.*) Persons with temporary disabilities (categories 1 and 3) may receive disability payments for a maximum of five years. (*See id.* at 7 (Schedule 1).)

### B. Permanent disabilities

Permanent disabilities (categories 2 and 4) are "[c]laims for disability benefits because of an employee's permanent inability to be gainfully employed at Upjohn or to be gainfully employed anywhere as a result of a qualifying disability...." (*Id.*) The claim procedure for permanent disabilities is more involved. In order to make a claim for permanent disability benefits, the employee is required to complete an Employee Statement regarding her disability, have her supervisor complete a Supervisor's Statement of disability, and have her physician complete a Physician's Statement of disability. (*See id.* at 11.) This information is then considered by Upjohn's Disability Committee, which determines whether the employee qualifies for benefits. (*See id.* at 12.)

Permanent disabilities are divided into two subclasses under the Plan for the sole purpose of determining the duration of disability payments. These two subcategories of permanent benefits are distinguished below.

### 1. Long–Term Disability ("LTD")

A person who is unable to be gainfully employed "permanently at Upjohn" but who might still be able to be gainfully employed elsewhere (category 2) receives benefits under the same payment schedule that governs temporary disabilities, and therefore may receive disability benefits for a maximum of five years. (*See id.*) This subclass of benefits is referred to interchangeably by Upjohn as "Upjohn-only disability," "Long Term Disability," or "LTD." However, these terms generate some confusion, because the Plan itself does not use the terms "Upjohn-only disability" or "LTD," and the term "Long Term Disability" is used in the Plan to cover *all* of the four categories of benefits for qualified disabilities under the Plan, regardless of whether the disability is tem-

porary or permanent. (*See id.* at 7–9, 11–13.)

### 2. Permanent and Total Disability ("PTD")

A claimant with a qualifying disability that prevents the employee from being gainfully employed "permanently anywhere" (category 4) may qualify for a longer period of disability benefits. An employee unable to work "permanently anywhere" may receive benefits for five years or until the age of 65, whatever period is greater. (*See id.* at 8 (Schedules 2–3).) This subclass of benefits is referred to interchangeably by Upjohn as "Permanent and Total Disability" or "PTD." However, these terms are also confusing, because the Plan does not use the terms "Permanent and Total Disability" or "PTD." (*See id.* at 7–9, 11–13.)

### C. Hamilton's claim

At the onset of her disability, Hamilton filed a claim for a temporary disability and was placed on extended sick leave beginning in July 1991. Throughout her absence from Upjohn, Hamilton made sure her medical care providers sent all pertinent information regarding her medical condition to Upjohn, specifically to Dr. Dale Peerbolte, a staff physician for Upjohn who was a member of Upjohn's Disability Review Committee. (*See* Hamilton Dep. at 43, 57–58, Pl.'s Ex. M.). Hamilton testified that she talked with Dr. Peerbolte "at least every month . . . if not more." (*Id.* at 32.)

In June 1992, Upjohn, on its own initiative, sent Hamilton "Health Status and Absence Payment Plan Information forms to determine if [Hamilton] qualif[ied] for payments under the Long Term Disability provisions of the Upjohn Absence Payment Plan." (*See* Letter from Buwalda to Hamilton of 6/30/92, Pl.'s Ex. D.) In addition to requesting that Hamilton fill out an Employee Statement, Upjohn also enclosed a Physician's Statement for Hamilton's physician to complete and notified Hamilton

that it had sent a Supervisor's Statement to Hamilton's supervisor, all in accordance with the claims procedure for obtaining permanent disability benefits outlined in the Plan. Hamilton did not receive permanent disability benefits at that time, as she was scheduled for surgery for her condition and job accommodations were being explored. (*See* Disability Check List, Pl.'s. Ex. E.) Instead, Hamilton continued on extended sick leave status as temporarily disabled.

Upjohn again initiated the process for permanent disability benefits in April of 1994, sending Hamilton an Employee Statement form and indicating that Upjohn would be sending a Supervisor's Statement to Hamilton's supervisor. Hamilton states that she filled out and mailed the Employee Statement to Upjohn on or about April 30, 1994. (*See* Hamilton Aff. ¶ 2, Pl.'s Ex. G.) However, at her deposition Hamilton could not recall whether she mailed the form to Upjohn or dropped it off with Dr. Peerbolte, an Upjohn staff physician and member of the Disability Review Committee. (*See* Hamilton Dep. at 80, Pl.'s Ex. M.) Upjohn denies ever receiving Hamilton's Employee Statement. (*See* Traxler Aff. ¶¶ 3, 4.) A "disability check list" prepared by Upjohn is equivocal on the issue, as the section designating whether the Employee Statement was received was initially marked "yes," but the "yes" was crossed out and "no" was written next to it. (*See* Disability Check List, Def.'s Ex. 21.)

Whether the Employee Statement was received or not, Upjohn's Disability Review Committee met on May 17, 1994, and considered Hamilton's application for permanent disability benefits. (*See* Mem. from Boersma to Hughes of 5/25/94, Pl.'s Ex. I.) Hamilton was notified by Upjohn on May 31, 1994, that she qualified for "Upjohn disability benefits" and that she would receive 60% of her base pay through June 30, 1995. (Letter from Burke to Hamilton of 5/31/94, Def.'s Ex. E at 38.) Upjohn indicated that Hamilton should

submit additional medical information if her medical condition changes, and also stated that "[i]f medical evidence supports a permanent and total disability under the terms of the plan, your coverage under the Absence Payment Plan may continue until age 65." (*Id.*) Two attachments to the letter also indicated that payments would terminate June 30, 1995, and Hamilton's employment would be terminated July 1, 1995, unless she was reclassified as "PTD." (*See id.* at 41–42.)

Hamilton testified that Dr. Peerbolte told her in the fall of 1994 that she did not need to keep in regular contact with him any more because he received regular reports from Dr. Todd Lininger, the doctor to whom Hamilton was referred by Upjohn, who was treating Hamilton for her disability. (*See* Hamilton Dep. at 32–33, Pl.'s Ex. M.) Dr. Peerbolte does not recall whether he told Hamilton that she no longer had to remain in regular contact with him. (*See* Peerbolte Dep. at 12–13, Pl.'s Ex. N.) Regardless, Dr. Peerbolte acknowledged that he received and reviewed a report from Dr. Lininger in October 1994 stating that Dr. Lininger did "not feel that [Hamilton] can return to any type of work at this time." (Letter of 10/21/94 from Lininger to VanLoon, Pl.'s Ex. Q.; Peerbolte Dep. at 10, Pl.'s Ex. N.) In May of 1995, Dr. Peerbolte received and reviewed another report from Dr. Lininger, in which Dr. Lininger indicated that "[w]ith regard to vocational issues ... Mary is [not] going to be able to return to any type of gainful employment ... this is going to be a permanent total disability." (Dr. Lininger's 5/3/95 report, Pl.'s Ex. R; Peerbolte Dep. at 11, Pl.'s Ex. N.)

Hamilton was terminated by Upjohn on July 1, 1995, after Upjohn received Dr. Lininger's statement that Hamilton was going to be permanently and totally disabled. After being awarded Social Security Disability Benefits in October of 1995, Hamilton requested that her benefits be continued under the Plan until she was 65 years old because she qualified for the

PTD subclass of permanent benefits. (*See* Letter from Geil to Simpson of 7/15/96, Pl.'s Ex. T.) Upjohn indicated that Hamilton's claim for continued payment of disability benefits was untimely because she was terminated from Upjohn on July 1, 1995, and that "[a]t the time of Merry's termination, she had not submitted medical evidence sufficient to warrant a re-examination of her disability status." (Letter from Boyer to Geil of 8/30/96, Pl.'s Ex. U.) After Hamilton objected to this denial, Upjohn indicated that her request for continued payment of disability benefits was also being denied because she failed to follow the procedure for applying for PTD benefits. (*See* Letter from Boyer to Geil of 4/23/97, Pl.'s Ex. Y.) After this final denial, Hamilton filed this action.

### *Standard*

Courts review an ERISA plan administrator's denial of benefits "under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). Where the fiduciary has such "power to construe disputed or doubtful terms, ... the trustee's interpretation will not be disturbed if reasonable." *Id.* at 111, 109 S.Ct. at 954. This deference is appropriate only when the plan's grant of discretionary authority is express. *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996). The parties agree that a *de novo* standard should be applied.

### *Analysis*

**A. The Plan's claim procedure is ambiguous as to whether Hamilton was required to file a second claim to obtain PTD benefits.**

The parties agree that the procedure for filing a claim for permanent disability benefits is outlined in the Plan. The parties disagree about whether, assuming Hamil-

ton did submit her Employee Statement in April of 1994[1], Hamilton was required to submit a second, separate claim in order to change her classification under the Plan from the LTD subclass of permanent disability benefits (category 2, unable to be gainfully employed "permanently at Upjohn") to the PTD subclass of permanent disability benefits (category 4, unable to be gainfully employed "permanently anywhere").

■ Hamilton argues that the Plan's procedure is ambiguous as to whether Hamilton was required to submit a second, separate claim in order to change her classification from LTD (category 2) to PTD (category 4). If the Plan is ambiguous, it must be interpreted in the light of extrinsic evidence, such as letters from the Plan administrator and the Plan's practice and custom in processing disability claims. *See Helwig v. Kelsey–Hayes Co.,* 93 F.3d 243, 251 (6th Cir.1996); *DiCioccio v. Duquesne Light Co.,* 911 F.Supp. 880, 900 (W.D.Pa.1995). Upjohn contends that the claim procedure is not ambiguous and must be enforced as written, without modification by any written or oral representations. *See Sprague v. General Motors Corp.,* 133 F.3d 388, 402–04 (6th Cir.1998) (en banc.), *cert. denied,* —— U.S. ——, 118 S.Ct. 2312, 141 L.Ed.2d 170 (1998).

Upjohn notes that Hamilton's claim, initiated in April of 1994, was considered by the Upjohn Disability Committee and ruled upon on May 17, 1994, when Upjohn found Hamilton eligible for the LTD subclass of permanent disability benefits (category 2, unable to be gainfully employed "permanently at Upjohn"). Upjohn argues that if Hamilton disagreed with this determination, she should either have (1)

followed the review procedure in the Plan concerning "any claim that may have been denied" (*see* Plan at 12, Pl.'s Ex. 1.); or (2) submitted a second claim, complete with a new Employee Statement, Supervisor Statement, and Physician Statement, requesting PTD benefits.

Upjohn's argument is not supported by the language of the Plan. The claim procedure for permanent disability benefits under the Plan does not distinguish, as Upjohn would have it, between LTD (category 2) and PTD (category 4) subclasses. (*See id.* at 11–12.) At no time does the Plan even use the terms "Upjohn-only disability," "LTD," "Permanent and Total Disability," or "PTD." In fact, the term "Long Term Disability" is used to encompass *all* four categories of disabilities under the Plan, including both temporary or permanent disabilities. (*See id.* at 7–9, 11–12.)

The only place in which the Plan distinguishes between the two categories of permanent disability benefits is in the payment schedules. A claimant with a permanent disability who cannot be gainfully employed at Upjohn but who might still be able to be gainfully employed elsewhere (category 2, so-called "Upjohn only disability" "Long Term Disability" or "LTD") may receive disability benefits for a maximum of five years, whereas a claimant who is permanently unable to be gainfully employed anywhere (category 4, so-called "Permanent and Total Disability" or "PTD") may receive disability benefits for five years or up to age 65, whatever period is longer. (*See id.* at 7–8.)

As a result, the Plan does not address the situation where an employee is awarded permanent benefits under the LTD

---

1. The Court avoids making a factual determination as to whether Hamilton actually submitted her Employee Statement because Upjohn considered Hamilton's application and awarded Hamilton LTD benefits on May 17, 1994, despite Upjohn's assertion that it did not receive Hamilton's employee statement. (*See* Mem. from Boersma to Hughes of 5/25/94, Pl.'s Ex. I.) Whether Upjohn received

Hamilton's employee statement is therefore irrelevant. The relevant consideration for the Court is whether Hamilton was required to submit a second, separate claim in order to be reclassified as PTD, and there is no factual question that Hamilton did not submit an employee statement for a second, separate claim.

subclass (category 2) for a maximum of five years because the employee might still be able to be employed elsewhere, but wishes her classification to be changed to PTD (category 4) due to her total inability to work anywhere, thus extending the benefit period until the employee reaches the age of 65. In this situation, the employee has already been awarded permanent benefits under the Plan—the only question is under which benefit schedule the employee should be considered. Therefore, the review procedure, which by its language only addresses "any claim that may have been denied," does not apply because the employee was not denied permanent benefits, but rather seeks reclassification under a different payment schedule. (*See id.* at 12.) Similarly, the claim procedure makes no indication that a second, separate claim would be required for an employee who already submitted 'a successful claim for permanent benefits but merely wanted to be considered under a different payment schedule. The Plan is simply silent on this issue.

Therefore, the Court finds that the Plan is ambiguous as to what procedure Hamilton should have followed in requesting that her classification of permanent benefits be changed from LTD (category 2) to PTD (category 4), such that the permanent benefits she was awarded would be extended until the age of 65. Accordingly, the claim procedure must be interpreted in the light of extrinsic evidence, such as letters from the Plan administrator and the Plan's practice and custom in processing disability claims. *See Helwig,* 93 F.3d at 251; *DiCioccio,* 911 F.Supp. at 900.

**B. Hamilton is entitled to PTD benefits.**

█ Once extrinsic evidence is considered in interpreting the Plan's claim procedure, this Court easily concludes that Hamilton followed the proper procedure to have her permanent disability reclassified as PTD (category 4), so that her permanent benefits could be extended until the age of 65. Upjohn indicated to Hamilton in its letter of May 31, 1994, awarding Hamilton "Upjohn-only benefits," that Hamilton should submit additional medical information if her medical condition changed and that "[i]f medical evidence supports a permanent and total disability under the terms of the plan, your coverage under the . . . Plan may continue until age 65." (Letter from Burke to Hamilton of 5/31/94, Def.'s Ex. E at 38.) Upjohn never explicitly or implicitly rejected Hamilton's claim for PTD benefits (category 4). Therefore, interpreting the Plan in light of this extrinsic evidence, all Hamilton had to do to extend her coverage to age 65 was submit additional medical evidence supporting a permanent and total disability (category 4).

Hamilton followed this instruction and provided Upjohn with undisputed evidence from the doctor to whom Upjohn had referred Hamilton, Dr. Lininger, indicating that Dr. Lininger did "not feel that [Hamilton] can return to any type of work at this time" and that "[w]ith regard to vocational issues, . . . [Hamilton] is [not] going to be able to return to any type of gainful employment . . . this is going to be a permanent total disability." (Letter of 10/21/94 from Lininger to VanLoon, Pl.'s Ex. Q; Lininger's 5/3/95 report, Pl.'s Ex. R.) Upjohn admitted that a doctor on Upjohn's Disability Review Committee received the letter and report from Dr. Lininger prior to Hamilton's termination in July of 1995. (*See* Peerbolte Dep. at 10–11, Pl.'s Ex. N.) There is no evidence in the administrative record that Hamilton was capable of being gainfully employed anywhere.

Accordingly, because the Court finds that Hamilton followed the proper procedure for reclassifying her permanent benefits as PTD benefits (category 4) and provided undisputed proof of her eligibility for PTD, Hamilton should be awarded PTD benefits retroactive to July 1, 1995, the date of her termination.

**840**

*Conclusion*

For the reasons stated previously, judgment on the administrative record will be entered in favor of Plaintiff.

An Order consistent with this Opinion will be entered.

### ORDER

For the reasons stated in the Opinion entered on this date,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Judgment (docket no. 33) is **GRANTED** and Defendant's Motion for Judgment (docket no. 35) is **DENIED.**